May it please the Court. Good morning, Your Honors. My name is Jill Sullivan. I represent the plaintiff and appellant Joan Kearney in this matter. Ms. Kearney filed this lawsuit in order to obtain redress for serious misconduct by government agents and a government official that ultimately deprived her of her Fifth Amendment right to just compensation for taking up her property in an eminent domain proceeding. I'm aware that the Court is very familiar with the appellate record, so I won't start at the beginning. I'll start by saying that this case highlights a constitutional tension between the Fifth Amendment right to just compensation for taking up property and defendants and respondents' claimed First Amendment rights to petitioning and free speech that they claim here immunize their wrongful misconduct. The defendants and respondents assert that their First Amendment rights protect conduct that includes making false representations to a citizen in order to gain access to her property. It includes breaking those contractual promises and concealing test results that were from tests conducted on a citizen's property. They contend the First Amendment protects continuing to suppress material evidence before, during, and after an eminent domain proceeding. They contend the First Amendment also protects telling a construction engineer not to create the promised record of those tests. They contend the First Amendment protects making false statements at the eminent domain proceeding and sponsoring false testimony at the eminent domain proceeding. Counsel, can I ask you, were all of these arguments made to the California courts? Most of them were, weren't they? Your Honor, the California courts, no California court, neither the trial court, Judge DeFilia, nor the courts of appeal ever was able to consider the material evidence that indicated the scope of the wrongful misconduct here because that material evidence continued to be concealed by respondents until after the time had run for Ms. Kearney to file her notice of appeal. Therefore, that evidence was never, ever in the appellate record before the California court of appeal. It was never reviewed or relied upon by Judge DeFilia in any action. Weren't there, didn't she make efforts to reopen and incite all of this evidence and that was all denied? That is correct, Your Honor. However, it was not denied on the merits. Her efforts to reopen this matter were denied on jurisdictional and procedural grounds. Judge DeFilia, when she attempted to reopen a matter after an appeal had already been taken from his denial of the new trial motion, held that he did not have jurisdiction at that time to review this material evidence of wrongful misconduct. It was not part of the appellate record at the court of appeal. It was submitted to the court of appeal and the court of appeal declined to consider the evidence. That was a procedural matter. There were procedural reasons why that happened, but no court has ever had the opportunity to examine the material evidence of wrongful misconduct here that tainted the entirety of the eminent domain proceeding, but that also was separate and apart from any petitioning conduct at the proceeding. The wrongful misconduct occurred before the proceeding, it continued to occur during the proceeding, and it continued to occur after the proceeding. The district court here erred in several material ways. The first way that I see that the district court erred was in not discussing or citing or explaining at all this Court's decision in Living Designs v. DuPont. In that case, very, very similar discovery misconduct was alleged. The conduct that was alleged in Living Designs included also concealment of test results, misrepresentations about the existence of those test results. And in Living Designs, even though that court didn't have occasion to address in any federal case, which holds that a party's litigation conduct in a prior case is entitled to absolute immunity and cannot form the basis of a subsequent federal civil RICO claim. Then this court, after Living Designs, decided Sosa v. Direct TV. And in Sosa, this court did discuss whether nor Pennington had any play in Living Designs. And what Sosa said about Living Designs was this. Even though we didn't discuss the nor Pennington doctrine explicitly in Living Designs, the misconduct at issue in that case would clearly have fallen within the third prong of Cottle's sham litigation exception to the nor Pennington doctrine, in that it amounted to a knowing fraud upon the court, depriving the litigation of its legitimacy. Ms. Kearney here makes the same allegation, that the nor Pennington's sham litigation exception applies such that the misconduct is not immunized by the First Amendment or by that doctrine, because the misconduct that occurred, whether it was before, during or after, deprived the entire eminent domain proceeding of its legitimacy. There was knowing fraud upon the court. That is the allegation here. The district court's failure to recognize the import of Living Designs and Sosa v. Direct TV by itself is, we submit, error that requires the challenged rulings to be reversed. But there are other reasons. The sham litigation decision that Judge Lorenz made in the district court below was based on an absolutely mistaken statement of fact in his holding. Judge Lorenz stated in the holding, in discussing whether the sham litigation exception should apply, that Ms. Kearney had the piece of evidence that should have led her to do additional further discovery, to discover the fraud and the knowing concealment, during discovery of the eminent domain proceeding. That was incorrect. It was not supported by the record before the district court. It remains unsupported by the record in this court. Judge Lorenz made a simple mistake of fact because the parties to this case agree that Ms. Kearney did not have the one piece of evidence that set off her alarm bells, that led her and her attorneys to think, wait a minute, this district has got to have done more percolation testing than it has ever revealed to me here. Is that that cost notice or whatever it was? It is, Your Honor. I actually have a blow-up of it if it would assist the court. Yeah, go ahead. Let's see it. The other side's seen it. This is in the appellate record. It's ER 151. And this is the document that Ms. Kearney received not through the process of discovery, as Judge Lorenz mistakenly thought, but she received this through an independent, third-party citizen after the conclusion of evidence of the eminent domain trial. That's how she got this document. That's uncontested in this case. This was never produced. I've done the highlighting here. This is the line item that shows that nearly $17,000 was spent by the district for construction testing and engineering to perform septic system testing and layout. This was the first time through the workings of this plain, honest citizen who came forward. We wouldn't have been here if it hadn't been for that one person who brought that document forward. But that was the document that led her to say, up until this point, all I knew is this. There is a document dated December 4th, before the district ever sought access from me to my property to conduct septic testing. There's a document that says they spent nearly $4,000, a relatively de minimis amount when we're talking about septic testing, on septic testing. Well, to me, Ms. Carney, that doesn't suggest any comprehensive percolation testing. I know they haven't even sought access to my property yet. And I know that I've asked in discovery through two separate document requests for documents that would certainly encompass percolation testing. My recollection, to review the record, was at some point, in fact, a neighbor had told her that people were out there, and then she notified them, you can't go out there without my permission. So she did know they were wandering around out there. Indeed, Your Honor. This is dated December 4th, December 12th, that same year. Ms. Carney became aware through neighbors that people were stomping around on the property. And she did say at that time, wait a minute, I want you to be bargaining with me about your entry onto my property. And that is the process that ensued, that the district and Ms. Carney, in support of negotiations toward a voluntary sale of the property, bargained for Ms. Carney's consent for the district to enter the property and conduct testing, and in exchange for that, a promise by the district, by Mr. Moser on behalf of the district, that the district would provide her with the results of any such testing. That was a bargain for promise. And so at this point, when she receives this document, she knows she has made, she has a promise from the district to provide the testing reports. She knows that her attorney has now, twice in the eminent domain proceeding, asked for documents that would undoubtedly encompass percolation testing. He asked for all documents from any agents of the district that relate to the property, that relate to the project. These were document requests that would encompass that. Mr. McCarty, at his deposition, did state, I think percolation testing has been done. After that statement, he confirmed, actually, via an email with the architect that percolation testing had been done, but he never revealed that email to Ms. Carney. And then after that point, Mr. Marshall, the trial lawyer for the district, continued to represent to Ms. Carney and her lawyers that all responsive documents had been produced. Now, the district court here thought that that document in front of the court now was produced in discovery. It wasn't. That was one of the reasons why the district court said, well, I guess she should have discovered the fraud. But what the district court and respondents here are really saying is something bigger than all of this. What they're really saying is that a national law firm can make false representations, conceal evidence in an eminent domain proceeding, conceal evidence, so long as they leave a few little breadcrumbs of clues so that a really attentive lawyer could discover the fraud. That is a position that this court should not countenance and, indeed, in the past, has not countenanced. In the Living Designs case, this court made a point of saying, membership in the bar is a privilege burdened with conditions. An attorney is received into that ancient fellowship for something more than private gain. He becomes an officer of the court and, like the court itself, an instrument or agency to advance the ends of justice. This imposition of a burden on attorneys who have, in good faith, asked for documents and who they believe, in good faith, have been told all responsive documents have been produced, this burden of imposing a cynical and skeptical view of opposing counsel is one that would literally bring our system of litigation to a halt if attorneys were required to view their opponents with such cynicism and skepticism. Counsel, I looked, and I couldn't find any evidence of this, but was there any suggestion or allegation that this was somehow nonproducible or nondiscoverable work product or some such thing? It's an interesting question, Your Honor, because at the trial stage, there was a privilege log that was produced. The percolation testing was not on the privilege log. Now, after the trial and after this document raised Ms. Kearney's alarm bells, Ms. Kearney's lawyers made a Public Records Act request, and in that Public Records Act request, they asked for specifically, we want the percolation testing that is shown by this document that we now know about. Only then did the district start asserting a privilege to the percolation testing documents. Well, I know that. I remember that it was done later, but I mean during the litigation itself. During the litigation itself, Your Honor, the privilege log showed no percolation testing and asserted no privilege as to the percolation testing. So we have a failure to discuss determinative cases, a mistake of fact by the district judge. We also have, I submit, an overly broad application of the Norr-Pennington Doctrine here to government agencies which are not entitled to a full-bodied Norr-Pennington privilege according to this Court's own precedence. I'd also need to address the anti-SLAPP standard. It also is addressed at petitioning conduct, and we have argued a lot in the briefing that certain of the conduct that forms the bravamen of Appellant Kearney's claims is not petitioning conduct, first of all. It is not part of the eminent domain process because even if you could say that seeking access to the property is part of the eminent domain process, making false promises in order to seek access is not part of that statutory scheme. And if we say it is, then we are literally telling government agencies that they can say whatever they want to with impunity to citizens under a statutory scheme in order to gain access to the citizen's property. That cannot be the case. That is one reason why it's not petitioning conduct under anti-SLAPP. Another reason why these things are not protected as petitioning conduct under the California anti-SLAPP statute is because that statute requires that the conduct be communicative and active. The Benocera case and the Jesperson case out of the California Court of Appeals show that failures to act, such as the suppression of evidence, do not constitute petitioning conduct. Even in Benocera, where lawyers represented conflicting interests in an arbitration, the California Court of Appeals held that that was not petitioning conduct, where the lawyer is cross-examining his former client, because the duty of loyalty breach started before the arbitration, when the attorneys took on the conflicting representation. That was when the breach occurred. Here, the same as our false promise is separate from this petitioning conduct. And the conduct that occurred during the eminent domain proceeding under Knorr-Pennington is protected by the sham is not protected because of the sham litigation exception under the anti-SLAPP statute. It's not protected because it's not communicative and active. And then we have the separate California Public Record Act requests. Those are not part of petitioning conduct. So the district court erred in that way also. I'd like to save the rest of my time for rebuttal, Your Honors. Thank you. I look forward to talking to you again. Well, your claim is primarily against the law firm, against Mosier. And you didn't sue the district. You didn't sue the district. We did not sue the district, Your Honor. And you're just after the law firm. We actually sued Mr. McCarty, the business manager for the district. Yeah. And we also sued Foley and Lardner and two of the individuals who were primarily involved. The lawyers. The lawyers. Mr. Marshall, the trial lawyer. Mr. Mosier, the general counsel for the district. Okay. Well, you know, you just heard one of the best oral arguments I've heard in a long, long time. So I'm anxious to hear what you have to say. Your Honor, Seth Galanter. I'm representing the lawyers, Foley and Lardner, Larry Marshall, and Greg Mosier, who were the private attorneys retained by the district. Yeah. Yeah. With me at counsel tables, Paul Corelli. He's representing the school district official. I'll be speaking for 12 minutes or however long you keep me up here. And Mr. Corelli will be following me for three to follow up on any particular issues related to the school official. I'd like to, you're right, it was a very impressive oral argument. I'd like to focus on three issues, I think. One, Norr Pennington, obviously. Well, focus on withholding that report. Well, Your Honor, you have to look at the timeline a little differently. I would like to push back the timeline to September of, excuse me. Well, there was a report. There was a percolation report. It was never turned over to the owner of the property. That's correct. It wasn't turned over. That report would have greatly increased the value of the property. Well, Your Honor, that is her allegation, yes. It wasn't turned over until November 2002, that's correct. That's after she got paid off, right? After the jury rendered its verdict. All right. So if that report had been in evidence, then presumably the verdict would have been much larger. That's her allegation, Your Honor. Well, that's her allegation, all right. And we are at a 12B6 stage, but I do have to emphasize what she's suggesting is that discovery misconduct is the basis for RICO trouble damage action in federal court. Well, why shouldn't it be? Tell me why it shouldn't be. Well, a couple of reasons, Your Honor. They conspire, you know, they hold back information. They're lawyers. They should present it. And that's exactly... And, you know, this probably goes on a lot. But not too many people get caught, see. Well, Your Honor, I don't think... Regardless of its frequency, the point is this is the job for the state court. And the state court clearly had the means and the motive to police its own proceedings. It's a RICO claim. It's in federal court. It is, Your Honor. And the consequences, if your client loses, are severe. Yes, they are, Your Honor. And... So... But first... And now she's got a little leverage, see. Right? Your Honor, this has always been about... Both sides have had leverage throughout this proceeding. When, in this case, when you look back at the proceedings, you have to... in eminent domain matters, say, with the county of Los Angeles. And they make a full disclosure. Everything. You know, most of the people that are property owners that the county wants to buy, they can't go out there and hire a lot of people to figure out the value. The county does. You've got certified appraisers, and they go through the whole thing. You know, it's all open book. Yes, Your Honor. And, in fact, that... First of all, it's... Full disclosure. Yes, Your Honor. And that... Transparency. That is the... It's one of the problems we have in our country today. We don't have enough transparency. Your Honor... To be entitled to that report... Your Honor... Is it that report had been turned over? Your Honor, according to the complaint, yes, Your Honor. But I have to caution that they do not allege in their complaint that they ever asked for these percolation tests. All they say is they made broad discovery requests. The Superior Court found they did not ask for the percolation tests. I read somewhere they asked if there were other tests, and they were told no. In fact, when they asked Mr. McCarty in his deposition, he was told... He said, I think so. He said yes. Well, shouldn't he know? Well, Your Honor... Why didn't he say yes? He said, I think so. I can't... This is the allegation of their complaint, Your Honor, that he said, I think so. Well, you read his deposition. It's not in this record, Your Honor. The only thing that's in his record is their allegation that he was asked, are there percolation tests. He said, I think so. They did not ask, according to the complaint, where are they, who possesses them. They did not ask for the percolation tests after that point until after the jury had rendered its verdict. But if I could just go back, again, to September 2000, when this really started. The school district... She wasn't a lawyer at the time, was she? I do not believe she was, Your Honor. No, no. Then a different story. Go ahead. I... What happened then was the school district sent Ms. Kearney a notice saying, we're interested in taking your property by eminent domain. Then they sent her a notice saying, we pass the resolution of necessity to take your property by eminent domain. Then they tried to enter the property to do some testing of the land. She objected. And in December, we asked her for consent, which is one of the two ways that the statute anticipates entering someone's land to do testing for eminent domain purposes. And 12 days later, we initiated the judicial proceeding to commence the eminent domain. So the process of eminent domain really started in September and was continuing through. We were using the statutory method to get... To do tests on the land, which, as Judge Ezra noted, her neighbors watched and reported back to her. And then the testing, in fact, did take place in January and February. And... But she didn't... But it was not... She didn't ask for those tests, according to her own complaint. She does not allege she asked for those tests. When she asked about those tests, she was told, I think so, they were done. In addition, I'm looking for the big blow-up she was presenting. Right there. It's right in front of you. In front of me? Yes. You've got another one back there, too. Yeah. As you can see from the top left corner here, this one is dated November 29, 2001. Now, the discovery took place in this case in a... Excuse me. In a... In a... Excuse me. I'm looking for the dates. But it took place much earlier. She got, and it's in the record as an attachment to her complaint, the earlier version of this budget, which lists, I believe, like $4,000 for testing. She was told that they were going to be testing. In fact, she gave her consent for the testing. And they agreed that they would give her the report. Well, Your Honor, the lawyer did sign the letter. Now, you have to realize there was this back and forth. We sent a letter to her, to Ms. Kearney, and Ms. Kearney held it for over two weeks. She sent it back to us the day before we initiated the judicial proceeding. And then two weeks later, we obtained legal possession of the property and were able to test without her consent. Now, this case was dismissed on a motion to dismiss. Is that right? That's, well, yes, as to the federal claims, as to the state law claims. Oh, no, I'm talking about the federal claims. Yes, Your Honor. That's all we sit here and review of is the federal claims. Well, she has these pendent state claims. Well, I understand that, yes. And those were struck under the anti-SLAPP statute. Okay, that's right.  All right. So we have 12b6. Yes, Your Honor. It seems to me like there's a lot of ground here in substantial controversy, which, if they are correct, might give them a cause of action. I don't know. You know, I'm a little skeptical as I look at this about the RICO part of this case. I don't know whether there is the requisite predicate acts. But, but, and I'm not suggesting there is or there isn't, because I haven't gotten that far into it, nor would I. That would be for a motion for the district court. But they've made allegations, which, if all proven true, might give them a cause of action. I would resist that suggestion on at least two grounds, one, the Moore-Pennington ground, and, second, that we did urge the district court to dismiss for lack of a pattern of racketeering and other RICO elements. He didn't address that. But, of course, this Court can affirm on those grounds. It's de novo review. And we can press any alternative ground that was pressed below, even if the district court didn't rule on it. But what is the Moore-Pennington meant to protect? Your Honor, it certainly started as an antitrust doctrine, but this Court has expanded  What was it meant to protect? It was meant to protect petitioning. Petitioning the whom? Petitioning the government, Your Honor. These lawyers, the government? Well, Your Honor, these lawyers were petitioning on behalf of a client who was a government entity another government body. You mean to tell me, you mean to tell me if you're a lawyer and you're hired by a government entity that you get the protection of Moore-Pennington? Moore-Pennington. If you engage in misconduct? Moore-Pennington. Is that what you're saying? I'm saying, yes, Your Honor, that lawyers are That's lawyers got, you know, I don't know that they need that protection. Well, Your Honor, I believe this Court has crossed that bridge, certainly, in Sosa and in Freeman, where lawyers were named as defendants and were found to be protected by the Moore-Pennington doctrine. Four things that involved petitioning a court. And here, the school district was petitioning a state court to do something that it could not do on its own. Well, this, but the allegations here have nothing to do with the direct filing of the suit. What this has to do with is, essentially, they're withholding information. That's the allegation, which, of course, you have to assume for purposes of 12v6 is true, right? So for 12v6, what we have is your clients intentionally withholding information from her client and to a degree from the court. That is in derogation of the process. It isn't in aid of the process. But, Your Honor, with respect, Freeman was exactly that fact pattern as well. In that case, the claim was that the defendants had wrongfully withheld information in discovery. And this Court held that that conduct was protected by the Moore-Pennington doctrine and could not be the basis of a collateral suit, a derivative suit, to challenge what happened in the first litigation. I want to emphasize that the state court was an appropriate forum to raise these issues. She did raise these issues in her new trial motion. She could have sought further discovery. She may have even been able to ask for sanctions. She didn't do any of those things against the school district or against the lawyers there. Instead, she brought – she waited and then she brought a collateral action claiming a RICO conspiracy in Federal court, basically challenging the entire conduct of the jurors in the first trial. She's basically trying to create a habeas-like proceeding to review the results of the first trial and get herself the difference that she claims she's owed. And that's exactly the kind of thing that the finality interests that Moore-Pennington is also protecting here, as well as it's protected by the California litigation privilege and the California anti-SLAPP statute. It's to prevent the chill that would occur if every time a school district filed an eminent domain proceeding, they had to worry about if we don't – if the plaintiff – if the property holder doesn't get what she wants, she's going to end up suing our officials for RICO. Well, you know, they don't have to worry about it. Those big private lawyers that they hire have to worry about it. Well, with respect, Your Honor, she's also named a school official as one of the RICO defendants. Yes. And, yes, and the private lawyers. And obviously – They're the ones that have to worry about it. Well, Your Honor, I think everyone who's sued under RICO worries, and the people who end up paying are the people who are going to have to pay higher rates and cover the higher insurance premiums if cases like this are allowed to go forward. But this is good for the insurance companies, and they make more money. Well, Your Honor, she elected not to sue the school district. I mean, don't try to intimidate us with higher insurance premiums and the floodgates opening up. Well, Your Honor, I mean, this is – The world is still here. It is, Your Honor, in part because this court has adopted a rather vigorous reading of Norm Pennington. Well, in Freeman, which was a 2005 case, this court said that only litigation activities which constitute, and I quote, communications to the court may be described as petitions. And the court went on to say a complaint, that such communications include complaint, answer, counterclaim, or other assorted documents in which plaintiffs or defendants make representations or present arguments in support of the request that the court do or not do something. That's correct. Here is exactly the opposite. Except, Your Honor, if you keep reading in Freeman, I believe it's the next couple paragraphs, they say Norm Pennington doesn't just protect petitioning, he protects conduct incident to the petitioning. And the discovery dispute there, which included the failure to provide discovery, was found to fall within the incident to petitioning, but was still protected by Norm Pennington. And that – But what about the sham litigation exceptions, Norm Pennington? Thank you, Your Honor. I mean, the other part is what she doesn't really – this court has never found a sham in a case like this. The underlying case is undisputably legitimate. The school district had every right to initiate this proceeding. Every right to hide evidence? Under state law, Your Honor, there were mechanisms in place, but she had an impartial judge, an impartial jury. She had opportunities for the – Well, that judge and jury didn't have the evidence. I mean, I don't care how impartial they are. Well, two things, Your Honor. First of all, the only evidence about percolation there was the evidence she submitted from her own testing from 1996. And she had known for over six months that this eminent domain proceeding was going to go forward. She did not engage in any further testing. It's true that it – Counsel, I think that's a terrible argument. What you're suggesting is that she did some testing, and her testing wasn't as good as your testing. Your testing was better, and your testing found that your client, your ultimate client in this case, not in this case, I'm talking about the previous litigation, the district, would have been more substantially responsible. And so, therefore, it's her fault because her testing wasn't as good as yours, so it was okay for you to hide the test. That was not – If that's what you're saying, that's a really terrible argument. It is, Your Honor, which is why I'm not saying that. What I am trying – what I was trying to say was that the availability of proof was available to both sides. It wasn't available to both sides because your client had much better evidence of what went on, was asked for it, kind of hemmed and hawed around about it, didn't turn it over, and then it only later became apparent that it happened. And then after the fact said, oh, this is privileged. Well, Your Honor, that privilege was about a separate records request, and ultimately the district elected to waive the privilege and turn over those documents. And yet she did not then go back to – she did not utilize available state court procedures to try and get a new trial based on that evidence. You know, there are certain doctrines in the law which provide that certain conduct has to be immunized because of the collateral consequences of it. For instance, a judge can say really terrible things from the bench that would be otherwise quite actionable, but because – and maybe that judge should and would be removed from the bench for those actions, but couldn't be sued because judges have absolute immunity. What you're basically saying or suggesting is that Norah Pennington immunizes your client from what are really terrible actions. And maybe that's right. Maybe that's right. But I think it's disingenuous to suggest that what was done here was okay, because I don't think it was okay. I think, Your Honor, that I'm not – I think the analogy to the judicial immunity is appropriate in the sense we are not suggesting that the state court could not have policed this or that the state court could not have sanctioned this. The question is independent civil liability. And this Court's cases in Freeman, in Sosa, and most recently in Thiem's promotion all suggest that even conduct that is easily condonable – condemnable, excuse me, is not the basis for civil liability because we don't want to chill the lawsuit and because we do want to create a sense of finality. Once you've gone – California has a system. They've utilized that system extensively, including a motion for a new trial, including appeals, and the judge and the court of appeal found that there was a fair trial under California law. To then take that and put it under the federal microscope in a federal RICO action is really to – is going to chill and it's going to affect the finality of these kinds of judgments. And I think that goes directly to the notion of sham because she did have these opportunities. Yes, it was not a perfect trial, Your Honor. And if these – there had been sanctions motions in the state court, there might well have been, you know, according – if this complaint were all true, there would have been serious problems. But she didn't seek sanction motions in the state court. She brought an independent tort in federal court where in this court, which has long held that this kind of litigation conduct, even if not complying with the rules of discovery, even if not complying with other rules, is not actionable under the First Amendment. Okay. Yeah, you're over your time. I apologize, Your Honor. If I may ask – I know I've exceeded my time, but I did mention Mr. Corelli might have something to say. Well, Mr. Corelli, we'd like to meet you. If I may please the Court, Your Honors. Paul Corelli on behalf of – by Dr. Michael McCarty, who is the business manager at the school district who's been sued in this matter. I wanted to go back and suggest to the Court that the person who probably had the best feeling for what was going on at the time of the trial was, in fact, the trial court judge, Judge DeFilia. I don't know if you are familiar with Judge DeFilia or have ever met him before, but he's a guy who I think has a reputation for having a very good street sense. And it was his sense in this case that all the information that Ms. Kearney had available to her to go and get the percolation testing documents and present them at trial was available to her. My client, Mr. McCarthy, said that during his deposition that he believed that testing had been done. He said, I think so, and to me that means yes on information and belief. And what Judge DeFilia said was it seemed to him that her lawyers weren't interested. Did your client know about this percolation test and the report that wasn't turned over? Well, my client knew that there was testing done, yes. I mean, did he know there was a report? I believe that he knew that there was a report. Well, I can't hear you. Yes, I believe so. As far as I can tell from the record that what we have to assume is true. Well, that report was supposed to be turned over. My understanding is that based upon the record that I'm looking at that the report... Well, they had a deal, didn't they? Didn't I see something? That's worse than that. They told him not to write a report. They told him not to write a report, yes. They didn't have a report, so they didn't turn it over, but they also didn't turn over the information. Well, that's the allegation now, is that it? Yes, that's the allegation. Well, is there anything incorrect about that? Well, what Judge DeFelia said about the whole thing, and counsel raised that issue at the trial court level and in the state court, was that her lawyers weren't interested in getting these new tests. What they were interested in was taking these 1996 tests, which they thought were good for them because they... No, they didn't know about the other. They didn't know about the other. What Judge DeFelia was saying was that... They didn't know about the other because they were with Hale. What, they didn't know what didn't hurt him? Yeah, that's what Judge DeFelia's point was, was they weren't interested in the new tests. Where did that come from? That comes from Judge DeFelia's... He actually said that? He says... Well, we come from rougher streets than he does, I'll tell you. He says, He says, Okay, that's not what I asked you. Did he actually say if they would have had the test, it wouldn't make any difference because it didn't hurt him? What he says was, and I'm quoting here, I think to me it was pretty clear that Kearney did not want to have a bunch of percolation information here. You wanted enough percolation information to appropriately suggest to the jury that the entire property would have perked and everything would have been perfect for the 16 lot subdivision, which is perfectly acceptable from the standpoint of trial tactics. But I must tell you that I'm terribly disappointed to see emotional alleging misconduct and intentional suppression of the evidence on the part of opposing counsel. To me, what he's saying there is suggesting that she wanted her test from 1996 because her experts could extrapolate that and make the property seem very valuable, and she wasn't interested in these tests because what if they went against her? And that to me is what I think... But actually, as a matter of fact, your client knew that the tests had occurred and they didn't go against her, but they were for her, and then they withheld them. Well, I don't know. I don't know if Mr. McCarthy knew that, whether he knew that or not. Well, the district knew it. I don't know whether the district knew that. But Mr. McCarthy's being seen there as individual in personal capacity. What kind of lawyers are representing these people if they don't read the report? I mean, this is mind-boggling to me. He's the business manager. He paid for these tests. He wouldn't know what the results were. He said, I don't want to see the test. Give me a wall-me-off from the test that I just paid for. What if the test would have been fabulous? What if the test would have shown that you couldn't build one house on the property? I'm sure we would have seen the test then. But I think the tests were designed to, because they wanted to build a school. The tests were done in furtherance of building a school, not for subdividing the property. So I don't know. These are the allegations that have been made in this particular case, and I don't know the ins and outs, and we wouldn't know that without further discovery. But I think this is a case I understand, Your Honor. But I think that the North Pennington Doctrine. Why don't you finish up? Okay. If Your Honor, I don't have further questions. We've certainly gone over the sham litigation and that sort of thing. Thank you very much. And I appreciate your time. Thank you. Thank you. Thank you, Your Honors. Two things. The Freeman case was discussed. The distinction between that case and this one that was specifically noted in that case is that in Freeman, the underlying discovery misconduct was found out and rectified in the underlying proceeding. That did not happen here. This is Ms. Kearney's only chance to rectify the fraudulent misconduct during the underlying proceeding, just as happened in Living Designs, which neither counsel mentioned just now. What counsel mentioned a lot was juxtaphelia and what juxtaphelia did. They're not saying the words collateral estoppel. There's a reason for that, because collateral estoppel does not apply here. First, what juxtaphelia held was that this piece of paper that was presented to him on the new trial motion, it didn't tell him whether prejudicial misconduct had occurred because he didn't know whether that meant that additional testing had actually occurred. What is really, really astounding is that if you look at the excerpts of record, page 183, you will see a declaration from Mr. Marshall that was for Mr. Miller, trial counsel for Ms. Kearney, that he had a conversation with Mr. Marshall, trial counsel for the district, in which Mr. Marshall told him, I was prepared to give up the tests at the new trial hearing. I was prepared to give those to you, but the court never asked me for them. This was the issue in the trial. It was the issue on the new trial motion, and the misconduct continued at the new trial motion with Mr. Marshall holding those tests in his back pocket, hoping the judge, Judge DeFelia, didn't ask him for them. Collateral estoppel does not apply here because the issues are not identical. Whether or not that document that Judge DeFelia saw indicates prejudicial misconduct is a totally different question than whether the evidence that now has been developed, that was withheld until after the taking of the appeal, that no court has ever seen, different question than whether that evidence shows attorney misconduct. There was no full and fair litigation of this matter. That's a separate reason that collateral estoppel doesn't apply. And finally, whether the attorneys had concealed evidence wasn't the basis of Judge DeFelia's decision. The basis of the decision was that that one piece of paper that Ms. Curran had, that was all she had at that time, didn't show him prejudicial misconduct. Okay. Thank you, Your Honors. All right. Thank you very much. We're going to take a, oh, somewhere between a 5- and a 10-minute break. And so this case is submitted. Thank you.
judges: Pregerson, Hall, Ezra